IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| LAUREN DODD, RICHARD SMITH, and AMANDA HAMMOND, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> INTERNATIONAL LONGSHOREMEN'S ASSOCIATION LOCAL 1475 CLERKS AND CHECKERS UNION, INC., <br><br> Defendant. | CIVIL ACTION NO.: 4:23-cv-327 |

**O R D E R**

Plaintiffs brought this putative class action against Defendant International Longshoreman's Association Local 1475 Clerks and Checkers Union, Inc.'s ("Local 1475") and International Longshoremen's Association ("ILA")[1] alleging a breach of the duty of fair representation to union members.  (Doc. 1.)  Presently before the Court is Local 1475's Motion to Dismiss, (doc. 11), and Request for Judicial Notice in Support of its Motion to Dismiss, (doc. 13).  Local 1475 moves to dismiss the Complaint, arguing that Plaintiffs' claims are barred by the applicable statute of limitations and that Plaintiffs have failed to allege facts showing Local 1475 acted arbitrarily, capriciously, or in bad faith.  (Doc. 12, pp. 8–13.)  For the reasons discussed below, the Court **GRANTS** Local 1475's Request for Judicial Notice as unopposed, (doc. 13), and **GRANTS** Local 1475's Motion to Dismiss, (doc. 11).

---

[1] Defendant ILA was dismissed from this action on March 21, 2024.  (Doc. 33.)

## BACKGROUND

**I.   Parties and Governing Agreements**

The facts below are set forth in the Complaint. (Doc. 1.) Local 1475 is a local labor organization that, along with ILA, serves as the bargaining representative for clerks and checkers in the Port of Savannah ("Port"). (Id. at pp. 3–4.) Plaintiffs are bargaining unit members of Local 1475. (Id. at p. 3.) ILA and Local 1475 are parties to a collective bargaining agreement ("CBA") with the Georgia Stevedore Association ("GSA") which governs the rates of pay, rules, and working conditions for clerks and checkers at the Port. (Id. at p. 7.)

Local 1475 operates a hiring hall where it assigns work to clerks and checkers in accordance with the order set forth in the CBA, referred to as the Savannah Clerks and Checkers Seniority Plan ("Seniority Plan"). (Id.) Under the Seniority Plan, clerks and checkers are grouped together in divisions known as "Classes." (Id. at p. 8.) Each Class consists of clerks and checkers who achieved at least 700 hours of work in a specific "contract year," and who maintained 700 hours of work in each contract year thereafter. (Id.) Under the Seniority Plan, contract years begin on October 1, and end on September 30, and are designated by the calendar years they straddle (e.g., 2023–24). (Id.)

The requirement to work at least 700 hours to establish seniority is in the ILA Constitution, which states that "[e]very local union shall have a seniority system requiring a minimum of 700 work hours or credited hours to establish a year of service" and that "[s]uch seniority system based on years of service shall be used to determine priority of employment for hiring purposes." (Id.) The Classes created under the Seniority Plan form a seniority-based system for assigning work to clerks and checkers. (Id. at p. 9.) Under the Seniority Plan, Local

1475 and ILA offer available work to all members of a Class before offering work to the next Class. (Id.)

## II. Creation of Emergency List and Changes to Seniority Plan

During contract year 2020–21, there was an unusual expansion of work at the Port, creating a temporary demand for additional clerks and checkers. (Id.) ILA, Local 1475, and GSA responded to the increased demand by creating an "Emergency List" of new clerks and checkers. (Id.) Local 1475 placed approximately 200 individuals on the Emergency List. (Id. at p. 14.) However, before announcing the creation of the Emergency List to members of the bargaining unit, Local 1475 recruited its leaders' family and friends to become clerks and checkers under the Emergency List. (Id. at p. 9.) In the Complaint, Plaintiffs identify twenty-two individuals who were either related to or close family friends of Local 1475 leaders who were added to the Emergency List. (See id. at pp. 10–13.)

At a Local 1475 meeting in February 2021, members asked Local 1475 leaders about the Emergency List. (Id. at p. 13.) In response, Local 1475 made the Emergency List available to members, but only if they signed up in person at a location within the Port during a single four-hour period occurring two days after the membership meeting. (Id. at p. 14.) Only those persons with valid Port credentials could access the location where the Emergency List signup occurred. (Id.)

ILA and Local 1475 required clerks and checkers on the Emergency List to execute a waiver of seniority rights as a condition of employment. (Id.) Consequently, Emergency List members who worked as clerks and checkers in the 2020–21 contract year had no seniority preference over the members who first worked as clerks and checkers during the 2021–22 contract year. (Id.)

On October 11, 2021, ILA, Local 1475, and GSA executed a Memorandum of Understanding ("2021 MOU"). (Id. at p. 15.) Under the 2021 MOU, Class "HH" consisted of individuals who worked at least 700 combined hours in the 2021–22 contract year. (Id.) Until June 19, 2023, Class HH consisted only of clerks and checkers who first worked in the 2021–22 contract year and clerks and checkers who first worked under the Emergency List. (Id.)

Beginning in February 2023, the amount of available clerk and checker work at the Port declined. (Id.) In the Spring of 2023, at the urging of ILA and Local 1475, GSA entered into a Memorandum of Understanding ("2023 MOU") that subdivided Class HH into two Subclasses designated as HH-1 and HH-2. (Id.) Local 1475 created these subdivisions because of a case filed against the union. (Doc. 13-4, p. 2.)[2] The 2023 MOU defined Subclass HH-1 as

> All individuals who worked at least 700 hours through the Local 1475 hiring system during both the 2020–21 and 2021–22 Contract Years, and all individuals who were on an [E]mergency [L]ist during the 2020–21 Contract Year and worked at least 700 hours through the Local 1475 hiring system during the 2021–22 Contract Year.

(Doc. 1, pp. 15–16.)[3] Class HH-2 was defined as "[a]ll other individuals who worked at least 700 hours through the Local 1475 hiring system during the 2021–22 Contract Year." (Id. at p. 16.) The 2023 MOU further provided, "For purposes of hiring preference within in the HH classification, all members of the Sub-classification HH-1 will be referred work they are qualified to perform before any jobs are offered to members of Sub-classification HH-2." (Id.)

Local 1475 did not disclose to members that the Emergency List, and consequently part of the HH-1 Subclass, was populated with Local 1475 leaders' family and friends. (Id.) On May

---

[2] For the reasons discussed in Discussion § I, infra, the Court has taken judicial notice of certain undisputed facts even though they were not included in the Complaint.

[3] Despite these requirements, Plaintiffs allege that approximately thirty persons who appear on the Emergency List and who are now assigned to Subclass HH-1 performed less than 700 work hours or credited hours during the 2020–21 contract year. (Doc. 1, p. 17.)

11, 2023, Local 1475 members voted to ratify the 2023 MOU in a single day ratification vote. (Id. at p. 17.)  On June 19, 2023, ILA and Local 1475 carried out the division of Class HH into Subclasses HH-1 and HH-2.  (Id.)

Because of the Class division, the amount of work available to members of Subclass HH-1 increased substantially, and the amount of work available to members of Subclass HH-2 declined substantially.  (Id. at pp. 17–18.)

### III.     Procedural History

Plaintiff Amanda Hammond filed an unfair labor practice charge with the National Labor Relations Board ("NLRB") on May 17, 2023.  (See docs. 13-1, 13-2.)  The Charge alleged that Local 1475 "violated [29 U.S.C. § 158](b)(1)(A) and (2) by operating the hiring hall in manner that [was] arbitrary, discriminatory, or in bad faith, by splitting the HH seniority group into two sub-groups." (Doc. 13-2, p. 2.)  The NLRB dismissed the charge, finding the division "was not so far outside the wide range of reasonableness afforded to labor organization[s] when administering their duties as to be deemed arbitrary or irrational."  (Id.)  The NLRB dismissal also stated that insofar the challenge was based on the previous creation of the Emergency List, that act occurred more than six months before the Charge was filed and could not be considered. (Id.)

Plaintiffs sued Local 1475 and IRL ILA in this Court on November 9, 2023.  (Doc. 1.)  In the Complaint, Plaintiffs bring one claim under the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(b)(1)(A) and (2).  (Id.)  Specifically, Plaintiffs allege that Local 1475 violated the duty of fair representation by dividing Class HH into subclasses and by not disclosing Local 1475 leaders' personal ties to individuals on the Emergency List before the ratification vote. (See generally id.)

On December 29, 2023, Plaintiff Hammond filed an appeal of the NLRB decision to the NLRB's Office of General Counsel. (See doc. 13-3.) The appeal was denied on January 23, 2024, based on the determination that "[p]revious litigation and facts presented . . . belie[d] [the] notion" that "the composition of the [Emergency List]"—that being "friends and family of local union leadership"—was "concealed from members who voted to approve the HH subgroups addressed in the [2023] MOU." (Doc. 13-4, p. 2.)

Local 1475 filed the at-issue Motion to Dismiss on January 29, 2024, arguing that the Court should dismiss this action because (1) it is barred by the six-month statute of limitations, and (2) it is inadequately pled. (Doc. 11.) Local 1475 also requests that the Court take judicial notice of Hammond's previously-filed grievance and the NLRB's disposition of that Charge. (Doc. 13.) Plaintiffs filed a Response to the Motion to Dismiss, (doc. 18), but did not respond to Local 1475's Request for Judicial Notice. Local 1475 filed a Reply. (Doc. 31.)

**DISCUSSION**

**I.    Judicial Notice (Doc. 13)**

In connection with its Motion to Dismiss, Local 1475 moves the Court to take judicial notice of certain facts on which it relies in its briefing. (See generally doc. 13.) Specifically, Local 1475 asks the Court to take judicial notice of (1) the NLRB Charge filed against Local 1475 by Plaintiff Hammond on May 17, 2023; (2) the NLRB's letter, dated December 18, 2023, dismissing Hammond's claim; (3) the NLRB's letter, dated December 29, 2023, acknowledging receipt of Hammond's appeal; and (4) the NLRB Office of General Counsel's letter, dated January 23, 2024, denying Hammond's appeal. (Id. at pp. 1–2.) Local 1475 also asks that the

6

Court take judicial notice of the contents of the Seniority Plan, the 2021 MOU, and the 2023 MOU.[4]  (Id. at p. 2.)

A court on its own and at any time may judicially notice a fact that cannot be reasonably disputed because it either is generally known or can be readily and accurately determined from sources whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201(b)–(d).  As Local 1475 highlights in its Reply, Plaintiffs failed to object to the Judicial Notice Request.[5]  (Doc. 31, p. 1.)  Accordingly, the Request appears to be unopposed.  See L.R. 7.5 ("Failure to respond . . . shall indicate that there is no opposition to a motion.").  Given that Local 1475 has provided a sound legal basis for its proposed judicially noticed facts, and because Plaintiffs have failed to show how these facts could be reasonably disputed, the Court **GRANTS** Local 1475's Request.  Accordingly, the Court will consider the NLRB charge and its disposition for the purposes of Local 1475's Motion to Dismiss.  See Steward v. Int'l Longshoremen's Ass'n, No. 3:16-CV-1194-J-39PDB, 2019 WL 5188524, at *10 (M.D. Fla. Aug. 2, 2019), *report and recommendation adopted*, 2019 WL 13065834 (M.D. Fla. Oct. 30, 2019), *aff'd sub nom.* 829 F. App'x 913 (11th Cir. 2020) (NLRB charges fall within ambit of judicially noticeable facts); see also Gross v. White, 340 F. App'x 527, 533 (11th Cir. 2009) ("[D]ocuments submitted by a defendant with a motion to dismiss . . . may be considered by the court if the plaintiff refers to those documents in the complaint and those documents are central to the plaintiff's claim."); Kavowras v. New York Times Co., 328 F.3d 50, 57 (2d Cir. 2003) (proper for district court to consider underlying NLRB charge).  The Court likewise takes judicial notice of the contents of

---

[4]  Local 1475 refers to the 2023 MOU as the 2023 Addendum.  (See generally doc. 13; doc. 13-7.)

[5]  Plaintiffs state only in passing that Local 1475 did not "argue the relevance or materiality of the documents it asks this Court to take judicial notice of," and they fail to argue that any of the proposed facts could be reasonably disputed.  (Doc. 18, p. 2.)

the Seniority Plan, the 2021 MOU, and the 2023 MOU that are referenced in the Complaint and which Local 1475 attached to its Request.

## II.     Motion to Dismiss (Doc. 11)

### A.     Statute of Limitations

Local 1475 first moves to dismiss the Complaint on statute of limitation grounds, arguing that the duty of fair representation claim is based on conduct that occurred outside the statutory period. (Doc. 12, p. 8.)  Specifically, it argues that the division of the HH class can only breach of the duty of fair representation if the Court finds that Local 1475 already breached the duty when it created the Emergency List, which occurred outside the limitations period.  (Id.)  The Court disagrees.

A claim for breach of duty of fair representation has a statute of limitations of six months. 29 U.S.C. § 160(b); DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 154–55 (1983).  When an unfair labor practice invokes earlier conduct outside the statutory period, the Supreme Court of the United States has outlined "two different kinds of situations." Loc. Lodge No. 1424 v. NLRB, 362 U.S. 411, 416 (1960).

> The first is one where occurrences within the six-month limitations period in and of themselves may constitute, as a substantive matter, unfair labor practices. There, earlier events may be utilized to shed light on the true character of matters occurring within the limitations period; and for that purpose [the statute of limitations] ordinarily does not bar such evidentiary use of anterior events.  The second situation is that where conduct occurring within the limitations period can be charged to be an unfair labor practice *only through reliance on an earlier unfair labor practice.*  There the use of the earlier unfair labor practice is not merely "evidentiary," since it does not simply lay bare a putative current unfair labor practice.  Rather, it serves to cloak with illegality that which was otherwise lawful.  And where a complaint based upon that earlier event is time-barred, to permit the event itself to be so used in effect results in reviving a legally defunct unfair labor practice.

Id. at 416–17 (emphasis added).

Plaintiffs' claim is based on Local 1475's division of the HH Class and its failure to disclose, before the ratification vote, that the proposed HH-1 Subclass consisted of leaders' friends and family. (See generally doc. 1.) Plaintiffs allege that the vote to ratify the 2023 MOU, which contained the HH Class division, occurred on May 11, 2023, and went into effect on June 19, 2023, both of which fall within the six-month period beginning on May 9, 2023. (Id. at p. 17.)

While the Emergency List may be relevant for showing who those individuals are and how they came to comprise the HH-1 Subclass, the action challenged in this lawsuit is the (existing and ongoing) division of the HH Class, not the original creation of the Emergency list.[6] Accordingly, because Plaintiffs' claims are based on actions that fall within the statutory period, Local 1475's Motion is not due to be granted on statute of limitations grounds.

### B.    Failure to Plead a Fair Representation Claim

Turning then to the merits of Plaintiffs' claim, the Complaint alleges that Local 1475 violated the duty of fair representation when it (1) divided the HH Class in two subclasses, and (2) misrepresented material facts about the 2023 MOU before the ratification vote. (Doc. 1, pp. 18–19.) Under the NLRA, "a labor organization has a statutory duty of fair representation . . . 'to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.'" Breininger v. Sheet Metal Workers Int'l Ass'n Loc. Union No. 6, 493 U.S. 67, 73 (1989) (quoting Vaca v.

---

[6] Local 1475, in its Reply, makes various merits-based arguments that the Court does not consider relevant to the statute of limitations argument. For example, Local 1475 argues that Plaintiff's claim falls outside the statute of limitations because the NLRB found the Emergency List to be lawful and the only way to find a breach of the duty of fair representation would be if Local 1475 failed to disclose something unlawful. (See, e.g., doc. 31, pp. 8–9.) Local 1475 gives no citation for this position, but even so, such would only be grounds for dismissal of Plaintiffs' claims on the merits—i.e., a finding that the duty was not breached—rather than on statute of limitations grounds.

Sipes, 386 U.S. 171, 177 (1967)). "[A] union breaches the duty of fair representation when its conduct toward a member of the bargaining unit is arbitrary, discriminatory, or in bad faith." Marquez v. Screen Actors Guild, Inc., 525 U.S. 33, 44 (1998). The burden to establish a breach of the duty of fair representation is "a substantial one." Harris v. Schwerman Trucking Co., 668 F.2d 1204, 1206 (11th Cir. 1982). And "mere negligence is never sufficient to sustain a claim for breach of the [duty of fair representation]." Roadway Exp., Inc. v. N.L.R.B., 427 F. App'x 838, 841 (11th Cir. 2011). Accordingly, the Court must consider whether Plaintiffs have alleged facts sufficient to support a finding that either of the challenged actions by Local 1475 can be characterized as arbitrary, discriminatory, or made in bad faith.

### (1) Splitting the HH Class

Turning first to Local 1475's decision to split the HH Class, the Complaint lacks allegations to support finding a breach of the duty of fair representation. First, there are no allegations that this division was arbitrary. "A union's conduct can be classified as arbitrary only when it is irrational, when it is without rational basis or explanation." Marquez v. Screen Actors Guild, Inc., 525 U.S. 33, 46 (1998). Put another way, "a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be *irrational*." Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 67 (1991) (internal quotations and citation omitted) (emphasis added). "This 'wide range of reasonableness' gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong." Marquez, 525 U.S. 45–46. "[N]either negligence of the union nor a mistake in judgment is sufficient to support a claim that the union acted [arbitrarily]," and "nothing less than a determination that the union acted with reckless disregard for the employee's rights or was grossly deficient in its conduct will suffice." Taaffe v. Bellsouth Telcomm., Inc., 204 F. App'x 823, 824 (11th Cir. 2006) (per curiam).

Here, Local 1475 made the decision to split the class to resolve a previously filed NLRB charge against it. (See doc. 13-4, p. 2.) Once Local 1475 proposed the class divide and membership voted to split the HH class, the charging party in that case withdrew the charge. (Id.) The Complaint alleges no facts indicating that this was not the motive for splitting the class or that the true motive was solely to show favoritism to certain friends and family contained on the Emergency List (and Plaintiffs filed no objections to the Local 1475 Request for Judicial Notice). Put simply, the Complaint lacks allegations indicating that the decision to split the class fell outside the "wide range of reasonableness" afforded to unions. Marquez, 525 U.S. at 45.

There is likewise no allegation to support a claim that Local 1475 acted discriminatorily by splitting the class. A union "may not discriminate against any member of the union or treat some members with hostility while favoring others." Oltmanns v. Int'l Longshoremen's Ass'n Loc. 1475 Clerks & Checkers Union, Inc., No. 4:18-CV-188, 2019 WL 2932754, at *6 (S.D. Ga. July 8, 2019), aff'd sub nom. Oltmanns v. Int'l Longshoremen's Ass'n, 837 F. App'x 689 (11th Cir. 2020) (quoting Smith v. Local 7898, United Steelworkers of Am., 834 F.2d 93, 96 (4th Cir. 1987)). To prove that a union's conduct was discriminatory, a plaintiff must establish "discrimination that is intentional, severe, and unrelated to legitimate union objectives." Beck v. UFCW, Local 99, 506 F.3d 874, 880 (9th Cir. 2007) (quoting Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emps. v. Lockridge, 403 U.S. 274, 301 (1971)).

According to the Complaint, the HH Class was split into subclasses based on objective criteria: that a member (1) had worked at least seven hundred hours in 2021–22; and (2) had worked at least seven hundred hours in 2020–21, or had worked under the Emergency List in

2020–21.[7]  (Doc. 1, pp. 15–16.)  Plaintiffs do not allege any facts indicating that these class distinctions were intended to discriminate against a particular class or that they were somehow not based on objective criteria.  Stated differently, Plaintiff has failed to allege facts tending to show "that the [u]nion treated her differently than other similarly situated [u]nion members. Barrington v. Lockheed Martin, 483 F. Supp. 2d 1154, 1166 (M.D. Fla. 2007), *aff'd*, 257 F. App'x 153 (11th Cir. 2007).

While Plaintiffs seem to believe that union leaders discriminatorily preferred union leaders' friends and family on the Emergency List by creating these subdivisions, it is undisputed that the HH-1 class was made in response to charges brought against the union after those on the Emergency List were made to waive seniority rights for the 2020–21 calendar year.  Nothing the Complaint or judicially noticed facts leads to an inference that discrimination was the true motive for the class divide.[8]  In other words, Plaintiffs have only speculated that, because union leadership's friends and family were on the Emergency List, the split must have been discriminatorily motivated to favor those individuals.  Beyond these speculative allegations, Plaintiffs have failed to allege that union leadership acted with hostility when it split the class or that it otherwise acted with some discriminatory purpose that was "intentional, severe, and unrelated to legitimate union objectives."  Lockridge, 403 U.S. at 301; Barrington, 483 F. Supp. 2d at 1166 (subjective belief that the union was seeking to protect certain individuals, with no further corroboration, was insufficient to show discrimination).

---

[7]  Moreover, while Plaintiffs may gripe with the composition of the Emergency List, that would be a challenge to the creation of the list to begin with, which—as discussed Discussion § I, supra—falls outside the limitations period and is not up for consideration in this action.

[8]  The Complaint does allege that thirty individuals who were on the Emergency List and now enjoy HH-1 status performed less than 700 hours of work during the 2020–21 calendar year, but it fails to allege that these individuals were friends or family members of Local 1475 leadership.  (See doc. 1, p. 17.)

Finally, the Complaint fails to allege that Local 1475 acted in bad faith. Bad faith means that "the union acted (or failed to act) due to an improper motive." Yeftich v. Navistar, Inc., 722 F.3d 911, 916 (7th Cir. 2013). Plaintiffs argue that Local 1475 acted in bad faith by giving seniority rights to those on the Emergency List because it has alleged that twenty-two of the approximately two hundred individuals on the Emergency List were friends or family of union leadership. Even assuming that this is an improper motive,[9] as already stated, Plaintiffs have failed to allege that those individuals' presence on the Emergency List were what motivated the division. Oltmanns, 2019 WL 2932754, at *6 ("merely stat[ing] that [an] action was done in 'bad faith,'" without "put[ting] forth subsidiary facts speaking to any [union] representative's state of mind," was insufficient to show bad faith on motion to dismiss). Nor, importantly, are there any facts pled that show any of the alleged family or friends ultimately *obtained* HH-1 seniority status. Indeed, as already noted, presence on the Emergency List alone did not lead to seniority status because the class divide required that individuals on the Emergency List work at least 700 hours in the 2021–22 calendar year.

Taken together with the judicially noticed facts, the allegations in the Complaint provide a reasonable factfinder with no basis, beyond mere speculation, to find that the class split was arbitrary, discriminatory, or made in bad faith. While Plaintiffs may feel wronged because some of Local 1475's leadership's friends and family may have ultimately received seniority status, there are insufficient facts to support an inference that the seniority rights were improperly bestowed. There is therefore no basis for finding that the class division breached the duty of fair representation.

---

[9] Plaintiffs do not direct the Court to any authority addressing nepotism in hiring or seniority rights. (See generally doc. 18.)

### (2) Failure to Disclose Membership of the Emergency List Before 2023 MOU Ratification Vote

Plaintiffs additionally argue that Local 1475 breached the duty by "keeping the rest of the members in the dark," that is, by failing to disclose the membership of the Emergency List before the ratification vote of the 2023 MOU. (Doc. 18, p. 20.) "[I]n an appropriate case a fair representation claim may be stated against a union for misrepresenting the terms of an agreement to its membership." Parker v. Connors Steel Co., 855 F.2d 1510, 1521 (11th Cir. 1988). "Intentionally misleading statements by union officials designed to persuade members to join in collective action, such as . . . ratification of a newly negotiated agreement, can supply the bad faith necessary to a [duty of fair representation] violation." Bautista v. Pan Am. World Airlines, Inc., 828 F.2d 546, 550 (9th Cir. 1987); see, e.g., Anderson v. United Paperworkers Int'l Union, AFL-CIO, 641 F.2d 574 (8th Cir. 1981) (duty of fair representation extended to statements made by union official, in seeking ratification vote, that a special security fund existed which guaranteed that severance pay would be available despite his knowing that no such fund existed). Plaintiffs do not argue that Local 1475 made a misrepresentation in seeking ratification of the 2023 MOU, but rather that it omitted information concerning the membership of the Emergency List, and consequently, omitted information of the potential HH-1 Subclass. This is not enough to support a finding that the duty of fair representation was breached.

First, Plaintiffs have provided no allegation or supporting authority that the specific membership of the Emergency List was a fact subject to disclosure before a ratification vote of the HH subclasses.[10] Local 1475 argues that no disclosure was necessary because "there is

---

[10] Indeed, Plaintiffs have failed to provide the Court with any authority stating that a failure to disclose information in a ratification vote is even actionable. (See generally doc. 18); see, e.g., Ackley v. W. Conf. of Teamsters, 958 F.2d 1463, 1472 n.6 (9th Cir. 1992) (noting unsettled authority between nondisclosure versus deliberate misrepresentations within the duty of fair representation).

14

nothing inherently unlawful about using referrals from the bargaining unit to meet an emergency need for workers." (Doc. 31, p. 9.) The NLRB previously concluded (twice) that a challenge to the Emergency List's existence was meritless. (Doc. 13-4, p. 2.) Local 1475 plausibly may have considered this information immaterial to disclosure and thus neglected to mention it before the ratification vote. There is no indication in the Complaint that Local 1475 officials made any affirmative misrepresentations or that they intentionally tried to conceal or misrepresent the membership of the Emergency List. See Oltmanns, 2019 WL 2932754, at *6 (plaintiff "merely state[d] that this action was done in 'bad faith,'" but failed to put forth "subsidiary facts speaking to any [union] representative's state of mind").

Absent any allegation that Local 1475 was obligated to disclose this information or that it intentionally concealed it before ratification, Plaintiffs have, at best, alleged a negligent failure to disclose, which cannot by itself carry their claim. Roadway Exp., Inc. v. NLRB, 427 F. App'x 838, 841 (11th Cir. 2011) (per curiam) ("[M]ere negligence is never sufficient to sustain a claim for breach of the [duty of fair representation, . . .] [n]or are simple mistakes of judgment during the representation.").

Moreover, even if the Court were to find this information material to the vote and that Local 1475 intentionally concealed it, Plaintiffs have failed to allege facts showing that this would have affected the outcome of the ratification vote. Ackley, 958 F.2d at 1472 (even assuming that nondisclosure could support a fair representation claim, plaintiffs failed to show how such nondisclosure would have changed the vote). Indeed, Plaintiffs have *not* alleged that they were unaware of the Emergency List's membership let alone that disclosure would have impacted the vote of a membership majority.[11] Any claim that such disclosure would have

---

[11] The NLRB, in ruling on Plaintiff Hammond's appeal, additionally noted that "the question of whether the [E]mergency . . . [L]ist was secret was previously raised and found without merit." (Doc. 13-4, p. 2.)

changed the outcome of the ratification vote is wholly speculative. Accordingly, Plaintiffs' assertions that Local 1475 failed to disclose its relationships to individuals on the Emergency List before the ratification vote splitting the HH Class is not enough to support a fair representation claim. Plaintiffs' claims are therefore due to be **DISMISSED**.

## CONCLUSION

"At its most rudimentary level, the union's duty of fair representation is a duty 'to make an honest effort to serve the interests of all, . . . without hostility to any.'" Emery v. Allied Pilots Ass'n, 222 F. Supp. 3d 1120, 1125 (S.D. Fla. 2016) (quoting Ford Motor Co. v. Huffman, 345 U.S. 330, 337 (1953)). And to prevail on a duty of fair representation claim, plaintiffs must do more than just show they are unhappy with the results of the union's decision-making. Jamison v. Air Line Pilots Ass'n, Int'l, No. 1:12-CV-00544-RWS, 2015 WL 1481470, at *7 (N.D. Ga. Mar. 31, 2015), *aff'd*, 635 F. App'x 647 (11th Cir. 2015). The Complaint does nothing to thwart the judicially noticed fact that Local 1475 split the HH Class in response to charges raised by union membership. The division was based on objective criteria, and Plaintiff fails to allege any facts, beyond mere speculation, that indicates Local 1475 was otherwise motivated by discrimination or improper motives. While Plaintiffs may be unhappy that those who were on the Emergency List were afforded higher seniority status than Plaintiffs' own, the Complaint has failed to show why such division, or the alleged failure to disclose the names of the Emergency List members, was legally improper. Accordingly, absent any allegations on which a reasonable factfinder could conclude that Local 1475's actions were arbitrary, discriminatory, or made in bad faith, Plaintiffs' duty of fair representation claim cannot proceed.

Based on the above, the Court **GRANTS** Local 1475's Request for Judicial Notice, (doc. 13), and **GRANTS** Local 1475's Motion to Dismiss, (doc. 11). The Court thereby **DISMISSES**

Plaintiffs' action against Defendant International Longshoreman's Association Local 1475 Clerks and Checkers Union, Inc. and **DIRECTS** the Clerk of Court to **CLOSE** this case.

**SO ORDERED**, this 22nd day of August, 2024.

_____
R. STAN BAKER, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA